IN THE UNITED STATES DISTRICT COURT,
FOR THE NORTHERN DISTRICT OF ALABAMA,
SOUTHERN DIVISION

```
                                )
OMNI FOODS, INC.,               )
     Plaintiff,                 )
                                )
vs.                             )    CV-03-H-2573-S
                                )
NORTH AMERICAN                  )
SPECIALTY INSURANCE             )
COMPANY, and QBE INSURANCE      )
CORPORATION,                    )
     Defendants.                )
                                )
```

04 OCT -8 AM 11:28

U.... .... ....  ....URT
H.D. OF ALABAMA

✔ENTERED

OCT 0 8 2004

## MEMORANDUM OF DECISION

### Procedural History

On July 22, 2003 Omni Foods, Inc. (hereafter "Omni") filed suit against North American Insurance Co. (hereafter "North American") and QBE Insurance Co. (hereafter "QBE") in the Circuit Court of Jefferson County, Alabama.  In its complaint Omni alleged breach of contract and bad faith failure to investigate claims against both defendants.  On September 19, 2003 QBE, joined by North American, removed the action to this court.[1]

The court has before it the separate motions of North American and QBE for summary judgment filed July 30, 2004, each motion being accompanied by a brief and supporting evidence filed the same day.  Plaintiff filed on August 30, 2004 separate briefs(denominated as "objections") and supporting evidence in

---

[1] On September 26, 2003 this court remanded the action for lack of diversity jurisdiction but upon reconsideration set aside the remand order on October 3, 2003.

35

opposition to the two summary judgment motions all of which also
is before the court.  The motions are now under submission.

## Undisputed Factual Background

Plaintiff, Omni, is a distributor dealing primarily in the
purchase and resale of food related products, including food,
paper products and chemicals.  (QBE Ex. 1 at 12)[2].  As part of
its business Omni owns and operates a storage warehouse located
at 2001 3rd Avenue, Bessemer, Alabama.  (QBE Ex. 2 at 2).  Omni
stores its products at the warehouse until they are resold and
either delivered to or picked up by their purchaser.  The
warehouse contains 50,000 square feet and consists of 11 storage
rooms.  Of the 11 rooms, 5 are used for cold storage.  Of the 5
rooms used for cold storage, 1 is a cooler room which is
maintained at a temperature of around 40OF. (QBE Ex. 1 at 102).
The cooler room is situated between two freezer rooms, which are
typically maintained at a temperature of around 10O F.  (QBE Ex.
1 at 128).  These three rooms sit in a straight line going north
to south.  (QBE Ex. A to Ex. 3 at 1).  The middle cooler room is
separated from the freezer room to the south by a single non-load
bearing ceramic tile wall consisting of two wythes[3] connected by

---

[2]  The parties in this case filed multiple exhibits, many of which do
not overlap.  Thus, each exhibit citation includes an abbreviation indicating
which party submitted the exhibit.  "Pl." indicates an exhibit filed by Omni;
"NAS" indicates an exhibit filed by North American; and "QBE" indicates an
exhibit filed by QBE.

[3]  A wythe is a continuous vertical section of masonry one unit in
thickness. The masonry used in subject wall was ceramic tile.

typical galvanized steel brick ties.  The northern wythe forms a part of the wall of the cooler room and the southern wythe forms a part of the freezer room.  Between the two wythes there are several inches of airspace.  (QBE Ex. A to Ex. 3 at 2).

Sometime around June 2000 the northern wythe collapsed. (QBE Ex. 1 at 58).  After the wythe collapsed, Arnold Shiland, the owner of Omni, solicited an estimate of the repair costs from Strozier Construction Company.  (QBE Ex. 1 at 37).  Strozier estimated that it would cost $38,673.00 to repair the wall.  (Pl. Ex. 3 at 3).  Omni was insured for specified losses to its building by North American from January 1, 2000 to January 1, 2001.  (NAS Ex. B at 10).  Shiland filed a claim with North American for the repair costs for the northern wythe.  (QBE Ex. 1 at 31).

North American hired Mason J. Dillard Co., Inc. (hereafter "Mason"), an insurance adjustment company, to investigate the claim, and on July 14, 2000 one of their agents inspected the wall and interviewed Arnold Shiland.  (Pl. Ex. 3 at 1).  Mason hired Joel Wehrman of Jade Engineering and Inspection, Inc. to visit the Omni building and determine what caused the damage to the northern wythe.  (Pl. Ex. 2 at 1).  Mr. Wehrman concluded that the variation in the temperature maintained in the freezer and cooler rooms caused the build up of ice bridges between the two wythes.  The ice bridges put pressure on the wall and led to

3

the collapse of the northern wythe inside the cooler room. Wehrman opined that the southern wythe inside the freezer room did not collapse in 2000 because it was supported by steel framing not present in the northern wythe. (Pl. Ex. 2 at 3). Pursuant to the reports from Mason and Mr. Wehrman, North American sent Omni a check for $28,0004.78 to cover the cost of repairing the damage to the wall. (NAS Ex. 1 at 38).[4]

Omni did not attempt to repair the damage from the June 2000 collapse until July 2002. (QBE Ex. 1 at 118). In July 2002 Omni began bringing the temperature of the three rooms up to 60ºF to facilitate the repair of collapsed northern wythe. (QBE Ex. 1 at 132). At this point Arnold Shiland noticed that the southern wythe, which in 2000 was undamaged, was now about to fall. (QBE Ex. 1 at 132). Mr. Shiland submitted a claim to North American for the damage to the southern wythe in 2002. (NAS Ex. E at 1). On Sept. 25, 2002 on behalf of North American, Mr. Wehrman again visited the Omni building to determine the cause of the collapse of the southern wythe. (NAS Ex. G at 1). While Mr. Wehrman was making his 2002 inspection, David Anderson of Premier Insurance Adjusters, Inc. (hereafter "Premier") was also present on behalf

---

[4] Because Omni did not meet the 80% co-insurance requirement, North American depreciated its payment on the claim for the northern wythe by 25%, citing cracks and other defects that decreased the wall's actual value. Omni also claimed damage to stock that was destroyed when the room collapsed, and Omni's policy had a $1,000.00 deductible. According to North American, after calculation of these factors $28,004.75 was the amount due. (Pl. Ex. 9 at 4).

4

of North American.   (NAS Ex. F at 1).   Pursuant to the
investigations of Mr. Wehrman and Premier, North American denied
Omni's claim for the 2002 collapse of the southern wythe.   (NAS
Ex. F at 2).

After North American's denial, Arnold Shiland submitted a
claim to QBE.[5]   (QBE Ex. 5 at 2).   QBE hired Anchor Managing
Agency (hereafter "Anchor") to supervise the investigation of the
claim.   (QBE Ex. 7 at 1).   Anchor hired Chris Payne, an insurance
adjustor with Mason J. Dillard and Co., to investigate the cause
of the 2002 collapse.   (QBE Ex. 2 at 2).   Chris Payne hired
Richard K. McFalls, an engineer with Carr & Associates, to
determine what caused the southern wythe to collapse.   (QBE Ex. 3
at 2).   After Chris Payne's determination that the southern
wythe's collapse was not covered by the QBE policy, (QBE Ex. 3 at
2), Anchor hired an attorney, James Witcher III of Hand Arendall,
L.L.C., to review the policy and give a coverage opinion.   (QBE
Ex. 7. at 3).[6]   QBE then determined that Omni was not covered

---

[5] Subsequent to the June 2000 collapse of the northern wythe, Omni
switched insurers and in July 2002 when the damage to the southern wythe was
discovered, Omni was insured by QBE.  The relevant policy period for the QBE
coverage was from January 5, 2002 to January 5, 2003.  (QBE Ex. 1 at 86; Ex. 5
at 2).

[6] Plaintiff contends the portion of Chester Hix's affidavit outlining
the investigation undertaken on behalf of QBE should be stricken from the
record because Mr. Hix did not provide a detailed account of the investigation
at his deposition when one was requested.  This court is surprised at the
narrow meaning Omni assigns Mr. Hix's statements.  Plaintiff presents no
evidence whatsoever that the facts as outlined in Mr. Hix's affidavit did not
happen.  In fact, the portion of Mr. Hix's deposition which Omni quotes, is
taken out of context and incomplete.  Mr. Hix did outline the steps he took in
investigating QBE's claim.  Omni's attorneys apparently chose to quote only a
portion of Mr. Hix's answer they found favorable.  At no time during his

under their policy and denied the claim.   (QBE Ex. 7 at 3).
After QBE denied the claim, Omni commenced this litigation.


## SUMMARY JUDGMENT STANDARD

Under Fed. R. Civ. P. 56(c), summary judgment is proper "if
the pleadings, depositions, answers to interrogatories, and
admissions on file, together with the affidavits, if any, show
that there is no genuine issue as to any material fact and that
the moving party is entitled to judgment as a matter of law."
See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Chapman
v. AI Transport, 229 F.3d 1012, 1023 (11th Cir. 2000).  The party
asking for summary judgment always bears the initial
responsibility of informing the court of the basis for its
motion, and identifying those portions of the pleadings or
filings, which it believes demonstrate the absence of a genuine
issue of material fact.  Celotex, 477 U.S. at 323.  Once the
moving party has met its burden, Rule 56(e) requires the non-
moving party to go beyond the pleadings and by its own
affidavits, or by the depositions, answers to interrogatories,
and admissions on file, designate specific facts showing that
there is a genuine issue for trial.  Celotex, 477 U.S. at 324.
The substantive law will identify which facts are material

---

deposition did Mr. Hix make any statements inconsistent with the investigation
he outlined in his affidavit.

and which are irrelevant.  <u>Chapman</u>, 229 F.3d at 1023; <u>Anderson v.</u>
<u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  All reasonable
doubts about the facts and all justifiable inferences are
resolved in favor of the non-movant. <u>Chapman</u>, 229 F.3d at 1023;
<u>Fitzpatrick v. City of Atlanta</u>, 2 F.3d 1112, 1115 (11th Cir.
1993).  A dispute is genuine "if the evidence is such that a
reasonable jury could return a verdict for the non-moving party."
<u>Anderson</u>, 477 U.S. at 248;  <u>Chapman</u>, 229 F.3d at 1023.  If the
evidence is merely colorable, or is not significantly probative,
summary judgment may be granted. <u>Anderson</u>, 477 U.S. at 249.

The method used by the party moving for summary judgment to
discharge its initial burden depends on whether that party bears
the burden of proof on the issue at trial.  See <u>Fitzpatrick</u>, 2
F.3d at 1115-17 (citing <u>U.S. v. Four Parcels of Real Property</u>,
941 F.2d 1428 (11th Cir. 1991)(*en banc*)).  If the moving party
bears the burden of proof at trial, then it can only meet its
initial burden on summary judgment by coming forward with
positive evidence demonstrating the absence of a genuine issue of
material fact; i.e. facts that would entitle it to a directed
verdict if not controverted at trial.  <u>Fitzpatrick</u>, 2 F.3d at
1115.  Once the moving party makes such a showing, the burden
shifts to the non-moving party to produce significant, probative
evidence demonstrating a genuine issue for trial.

If the moving party does not bear the burden of proof at

7

trial, it can satisfy its initial burden on summary judgment in either of two ways.  First, the moving party may produce affirmative evidence negating a material fact, thus demonstrating that the non-moving party will be unable to prove its case at trial.  Once the moving party satisfies its burden using this method, the non-moving party must respond with positive evidence sufficient to resist a motion for directed verdict at trial.

The second method by which the moving party who does not bear the burden of proof at trial can satisfy its initial burden on summary judgment is to _affirmatively_ show the absence of any evidence in the record in support of a judgment for the non-moving party on the issue in question.  This method requires more than a simple statement that the non-moving party cannot meet its burden at trial but does not require evidence negating the non-movant's claim; it simply requires the movant to point out to the district court that there is an absence of evidence to support the non-moving party's case.  _Fitzpatrick_, 2 F.3d at 1115-16.  If the movant meets its initial burden by using this second method, the non-moving party may either point to evidence in the court record, overlooked or ignored by the movant, sufficient to withstand a directed verdict, or the non-moving party may come forward with additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  However, when responding, the non-movant can no

longer rest on mere allegations, but must set forth evidence of specific facts. <u>Lewis v. Casey</u>, 518 U.S. 343 (1996) (citing <u>Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992)).

**I.   Omni's breach of contract claims**

Under Alabama law, claims for breach of an insurance contract are "governed by the general rules of contracts." <u>Twin City Fire Ins. Co. v. Alfa Mut. Ins. Co.</u>, 817 So.2d 687, 691 (Ala. 2001). Although insurers "are entitled to have their policy enforced as written," the court should interpret the contract consistently with the intent of the parties. <u>Id.</u> Accordingly, the "court must examine more than an isolated sentence or term; it must read each phrase in the context of all other provisions." <u>Attorneys Ins. Mut. of Ala., Inc. v. Smith Blocker and Lowther, P.C.</u>, 703 So.2d 866, 870 (Ala. 1996). When the insurer's defense is based upon an exclusion in the policy, the insurer bears "the burden of proving that a particular loss falls within an exclusionary clause." <u>Burton v. State Farm Fire and Casualty</u>, 533 F.2d 177, 178 (5th Cir. 1976).

The terms and conditions of insurance contracts "should be given the meaning that a person of ordinary intelligence would reasonably think the language had." <u>Schloss v. Cincinnati Ins. Co.</u>, 54 F. Supp. 2d 1090, 1093 (M.D. Ala. 1999). Whether an ambiguity exists is a question of law to be decided by the court. <u>Upton v. Miss. Valley Title Ins. Co.</u>, 469 So.2d 548, 554 (Ala.

1985).  Where an ambiguity does exist, the contract "will be construed liberally in favor of the insured and strictly against the insurance company."  Nat'l Union Fire Ins. Co. v. City of Leeds, 530 So.2d 205, 207 (Ala. 1988) (quoting Ho Brothers Restaurant v. Aetna Casualty and Sur. Co., 492 So.2d 603, 605 (Ala. 1986)).  Nevertheless, merely because the insured disagrees with the insurance company's interpretation of terms does not necessarily create an ambiguity.  Upton, 469 So.2d at 554.

### Omni's claim against North American

In its motion for summary judgment North American asserts that it is entitled to judgment as a matter of law based solely upon the fact that the damage to the southern wythe, which occurred in 2002, did not commence during the coverage period of its policy.  North American points to the "Commercial Property Conditions" portion of its insurance contract, which states in relevant part:

> 1.    We cover loss or damage commencing:
>        A.    During the policy period shown in the
>              Declarations; and
>        B.    Within the coverage territory

(NAS Ex. B at 82).  In the "Commercial Property Coverage Part Declarations" the policy period is shown as January 1, 2000 to

10

January 1, 2001.  (NAS Ex. B at 12).  There is no doubt that the definition of the term "commencing" means to begin.  Webster's New Collegiate Dictionary 225 (1977).[7]  Thus, any damage to the wythe which did not "begin" between January 1, 2000 and January 1, 2001 is not covered by North American's policy.

In support of its contention that damage to the southern wythe did not begin during its coverage period, North American points to the affidavit and attached report of Joel Wehrman.  (NAS Ex. G at 6 "attached letter").  Mr. Wehrman, a professional engineer, thoroughly inspected the collapse of the northern wythe and the southern wythe and concluded that 1) the southern wythe did not collapse for the same reason the northern wythe did, 2)the collapse of the southern wythe was not a "continuation" of the collapse of the northern wythe and 3) that the southern wythe was not damaged until shortly before its collapse in 2002.  (NAS Ex. G at 2).  Mr. Wehrman concluded that the southern wythe collapsed for one of two reasons.  (NAS Ex. G at 5 "attached letter").  Either the southern wythe was damaged in 2002 by the attempted repair of the northern wythe or the metal supports embedded in the southern wythe expanded when the temperature of the room was raised in 2002 to facilitate repairs.  (NAS Ex. G at 5 "attached letter").  Mr. Wehrman ultimately concluded that the

---

[7]  As a matter of law "commencing" is not ambiguous and the ordinary meaning that a reasonable person would attach to this word is "to begin."

expansion of the metal supports caused the damage because the southern wythe collapsed before any attempt to repair the northern wythe had been commenced. (NAS Ex. G at 5 "attached letter").

In response to North American's motion, Omni offers no affidavit or other admissible evidence contesting Mr. Wehrman's conclusions.[8] Rather, Omni points to the last paragraph of Wehrman's 2002 report, which suggests that both wythes be replaced in order to make sure the metal ties between the two walls are secure. (NAS Ex. G at 6 "attached letter"). Omni contends this paragraph of Wehrman's report means that the collapse of the southern wythe in 2002 was the result of, or part of, the loss caused by the collapse of the northern wythe in 2000. (NAS Ex. G. at 6 "attached letter"). Omni's argument is plainly incorrect. Wehrman's report, which Omni references, explicitly states that the 2002 collapse was not a continuation of the 2000 collapse, nor was it caused by the same phenomenon. (NAS Ex. G at 6 "attached letter"). While Omni correctly asserts that in 2002 Wehrman recommended the replacement of both wythes

---

[8] Although Omni does not choose to rely upon it, QBE presents the court with the affidavit of Chris McFalls, an engineer, who inspected the southern wythe after the 2002 collapse for QBE. (QBE Ex. 3). Mr. McFalls concluded that the 2002 collapse resulted from joint deterioration caused by ice accumulation. (QBE Ex. A to Ex. 3 at 4). It might be contended that an issue of fact arises as to whether "deterioration" was the real cause of the second collapse, and that the "deterioration" began in 2000, during the NAS coverage period. Even so this would not save Omni's claim because the NAS contract clearly excludes coverage for "wear and tear" and "deterioration." (Pl. Ex. 5 at 2).

in order to properly secure the metal ties, this in no way indicates that the cause of the southern wythe's collapse began in 2000.[9]

Omni also asserts that the collapse of the southern wythe in 2002 is a "supplemental" claim to the collapse of the first wythe. As support for this argument Omni does not point to any specific portion of the contract allowing for "supplemental" claims, but instead relies upon the deposition of James P. Barnette, apparently an employee of North American at the management level.[10] (Pl. Ex. 8). Mr. Barnette verified that a supplemental claim will be allowed if it is "related" to another covered loss. (Pl. Ex. 8). Though Omni does little to illuminate the definition of a "supplemental" claim, it appears that such a claim is also subject to the strictures of the policy coverage period. Thus, a claim can only be supplemental if the damage was caused during the coverage period. As stated earlier Omni has come forward with no evidence indicating that the damage to the southern wythe commenced during the period covered by

---

[9] Omni's argument seems especially tenuous in light of the fact that Wehrman also examined the southern wythe after the collapse of the northern wythe in 2000 and concluded that it was then in "good" condition. (Pl. Ex. 2 at 2). Mr. Wehrman's recommendation that both wythes be replaced in 2002, came only after the collapse of the southern wythe. (NAS Ex. G at 6 "attached letter"). Mr. Wehrman's report from his 2000 inspection did not recommend the replacement of both wythes nor did it indicate such was necessary. (Pl. Ex. 2 at 2).

[10] Omni does not indicate what position Mr. Barnette occupies within North American.

NAS's policy.

Omni offers no evidence (**admissible or otherwise**) contradicting the conclusion that the damage to the southern wythe did not commence during the coverage period of North American's policy.[11]  Because Omni has not met its burden to raise a genuine issue of material fact, North American's motion for summary judgment is due to be granted.  See Celotex, 477 U.S. at 324.

### Omni's claim against QBE

Defendant QBE contends that the 2002 collapse of the southern wythe was not covered under its policy, and thus, it was not obligated to pay Omni for the loss.  QBE relies upon several applicable exclusions under QBE's policy.  At the outset it should be noted that QBE bears the burden of proving that Omni's losses fall within policy exclusions.  Burton, 533 F.2d at 178. Specifically, QBE points to Section B of the insurance contract which provides the following:

    2.   We will not pay for damage caused by or resulting from any of the following . . .

        d.   (1)  Wear and tear;

---

[11]  Omni also argues that North American's payment for the collapse of the northern wythe deficient and that North American had no right to depreciate their payment.  North American based its depreciation on Omni's failure to meet its "coinsurance" requirement under the insurance contract. (Pl. Ex. 9 at 4; Ex. 12).  Omni fails to point to any evidence that it met the "coinsurance" requirement or that North American's depreciation was flawed. Thus, Omni's claim fails.

14

      (2)   Rust, corrosion, fungus, decay,
              deterioration, hidden or latent defect or any
              quality in property that causes it to damage
              or destroy itself; . . .

      (4)   Settling, cracking, shrinking or expansion; .
              . .

(QBE Ex. C to Ex. 9 at 2).   QBE presents the affidavit of Chris
McFalls, an engineer, who investigated the claim and examined the
collapsed southern wythe.  (QBE Ex. 3).  Mr. McFalls concluded
that the southern wythe collapsed due to "freeze-related
deterioration of the mortar joints."  (QBE Ex. 3 at 2).  As noted
above, QBE's policy excludes losses resulting from
"deterioration."

    While Mr. McFalls concluded that the southern wythe
collapsed as a result of deterioration, North American's
engineer, Joel Wehrman, reached a different conclusion.  Mr.
Wehrman concluded that the southern wythe collapsed due to the
expansion of metal support ties embedded in the wall.  (NAS Ex. G
at 2).  Thus, an issue of fact does exist as to the exact cause
of the southern wythe's collapse.  However, this issue of fact is
not dispositive because QBE's policy also excludes coverage for
"expansion."  Plaintiff presents no affidavits, depositions or
other admissible evidence of its own indicating the southern
wythe collapsed for any reason other than those identified by the

two engineers.  Because both possible causes of collapse are excluded under QBE's policy and Plaintiff raises no issue of fact as to the cause of collapse, as a matter of law the southern wythe's collapse is excluded from QBE's policy.

Omni responds by asserting that QBE waived its right to rely upon exclusions 2(d)(2) and (4) when it failed to mention these defenses in its letter denying Omni's claim.  First Alabama Bank v. First State Ins. Co., 899 F.2d 1045, 1063 (1990)[12].  Omni's contention is an incorrect reading of the law.  Under Alabama law "[i]f a coverage provision or an exclusion is unambiguous, it is not subject to waiver or estoppel."  Woodall v. Alfa Mut. Ins. Co., 658 So2.d 369, 372 (Ala. 1995).  Furthermore, QBE, upon whom the burden to prove exclusions rests, offers the affidavit of James Witcher, an experienced insurance attorney, who opined that Omni's claim falls within exclusions 2(d)(2) and (4).  (QBE Ex. A to Ex. 10 at 6).  QBE has met its burden.  See Fitzpatrick, 2 F.23d at 1115-1117.  Omni does not contend that the terms of the exclusions are ambiguous, nor do they appear to be, and Omni offers no evidence contesting that Mr. Witcher's conclusion that the loss is excluded.  Accordingly, QBE properly raises the

---

[12] Plaintiff correctly asserts that "[u]nder Alabama law, when an insurer specifically denies liability on one ground, it waives other grounds or defenses it might later seek to assert." First Alabama, 899 So.2d at 1063. However, as this court has recognized "defenses which are capable of being waived . . . are limited to defenses arising out of an express condition in the insurance contract." Wood v. Mut. of New York Life Ins. Co., 405 F. Supp. 685, 686 (N.D. Ala. 1975). The principle of waiver asserted by the Plaintiff does not apply to unambiguous exclusions. See e.g., Woodall, 658 So.2d at 372.

exclusions as defenses.

In its brief supporting summary judgment QBE raises several other exclusions as defenses.  The above reasoning illustrates as a matter of law the southern wythe's collapse is not covered under QBE's policy.  Therefore, the court need not carry its analysis any further, and, there being no dispute as to any material fact, QBE's motion for summary judgment is due to be granted.

**II.  Plaintiff's Bad Faith Claims**

In the instant case Omni has not shown that it is entitled to a judgment as a matter of law as to its contract claims.  In fact, as the earlier analysis indicates, the defendants are entitled to judgements as matter of law in their favor with regard to Omni's claims that defendants breached their obligation under their respective policies of insurance.  Accordingly, Omni's claims for bad faith under the "normal" theory fail. Employees' Benefit Ass'n v. Grissett, 732 So.2d 968, 976 (Ala. 1998).  However, if the court is wrong as regards Omni's contract claims, as the below analysis will show, both defendants are still entitled to summary judgment in their favor on Omni's bad faith claims.

To succeed on a claim for bad faith failure to pay an insurance claim a plaintiff may proceed using two different theories.  United Servs. Automobile Ass'n v. Hobbs, 858 So.2d

966, 974 (Ala. Civ. App. 2003).  When pursuing a "normal" bad
faith claim, a plaintiff must prove the following:

> (a) an insurance contract between the parties and a breach
> thereof by the defendant;
>
> (b) an intentional refusal to pay the insured's claim;
>
> (c) the absence of any reasonably legitimate or arguable
> reason for that refusal (the absence of a debatable reason);
>
> (d) the insurer's actual knowledge of the absence of any
> legitimate or arguable reason;

Grissett, 732 So.2d at 976.  The plaintiff must prove that he is
"entitled to a directed verdict on the contract claim and, thus,
entitled to recover on the contract claim as a matter of law."
Nat'l Sav. Life Ins. Co. v. Dutton, 419 So.2d 1357, 1362 (Ala.
1982).  If the proof offered does not establish that plaintiff is
entitled to a judgment as a matter of law, then the bad faith
claim should not go to the jury and the defendant is entitled to
a judgment as a matter of law as to the claim.  Grisset, 723
So.2d at 976.  However, merely because a plaintiff does not
receive a judgment as a matter of law will not defeat the
plaintiff's claim, "as long as the trial court correctly
determines that the plaintiff has met the standard of proof
required for a JML."  Id.

Under the second theory or "abnormal" bad faith claim, a

18

plaintiff must prove "the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay a claim." <u>Hobbs</u>, 858 So.2d at 976.  The defendant's failure to investigate, if not intentional, must have been so "recklessly ommissive," that the defendant did not "subject the results of its investigation to a cognitive evaluation." <u>Grisset</u>, 732 So.2d at 976.  Recklessness or intentional failure to investigate "may be inferred [from] . . . a reckless indifference to facts or proof submitted by the insured." <u>Id.</u>  In such "abnormal" cases it is not necessary for the plaintiff to prove that he is entitled to a judgment as a matter of law to proceed to a jury.  <u>Id.</u>

### Omni's claim against North American

North American must show that there is no genuine issue of material fact as to at least one element of Omni's bad faith claim.  As noted, Omni may proceed on both "normal" and "abnormal" theories of recovery.  While Omni asserts in its brief that its claim against North American is of the "abnormal" variety, the evidence suggests otherwise.[13]  Nevertheless, for

_____

[13] In <u>Nat'l Ins. Ass'n v. Sockwell</u>, the Alabama Supreme Court noted that its earlier precedents limit "abnormal" bad faith claims to "instances in which the plaintiff produce[s] substantial evidence showing that the insurer (1) intentionally or recklessly failed to investigate the plaintiff's claim; (2) intentionally or recklessly failed to properly subject the plaintiff's claim to a cognitive evaluation or review; (3) created its own debatable reason for denying the plaintiff's claim; or (4) relied on an ambiguous portion of the policy as a lawful basis to the deny the plaintiff's claim." 829 So.2d 111, 130 (Ala. 2002).  Here Omni does not offer "substantial evidence" supporting any of these theories, which suggests that Omni's claim

purposes of a thorough evaluation the court will address both theories.

For the limited purpose of Omni's bad faith claims the court assumes Omni has met elements (a) and (b) of the "normal" claim. Thus, at the outset the court accepts that 1) Omni had a contract with North American, 2) North American breached the contract and 3) it intentionally refused to pay the 2002 claim.  Assumptions notwithstanding, if North American shows that Omni cannot meet the burden of proof as to elements (c) or (d) of the "normal" claim, then summary judgment is proper.

To satisfy element (c) of a "normal" claim the evidence must show that North American had no "reasonably legitimate or arguable reason . . . (the absence of a debatable reason)" to refuse Omni's claim.  Nat'l Sec. Fire and Casualty Ins. Co. v. Bowen, 417 So.2d 179, 183 (Ala. 1982).  A "debatable reason" is "one that is open to dispute or question."  Id. Element (d) of the "normal" claim requires evidence that in refusing Omni's claim, North American was aware that it had no arguable reason to refuse the claim.  Id.

North American presents the court with the affidavits of Linh Freeman and Joel Wehrman.  (NAS Exs. F & G)  Linh Freeman is the third party claims administrator for North American who

---

should not be characterized as one for "abnormal" bad faith.  Id.

handled Omni's claim.  (NAS Ex. F at 1).  Joel Wehrman is a
professional engineer, licensed in Alabama, who investigated
Omni's claim.  (NAS Ex. G at 1).  As part of handling Omni's
claim Linh Freeman hired Premier Insurance Adjusters and Joel
Wehrman to investigate the collapsed wythe.  (NAS Ex. F at 1).
Mr. Wehrman investigated the collapse of the southern wythe and
determined that the cause of collapse originated in 2002 and did
not occur in 2000 during NAS's coverage period.  (NAS Ex. G at
2).  Likewise, Premier's report gave no indication that the
second wythe was damaged during NAS's coverage period.  (NAS Ex.
F. at 2).  Freeman received the reports from Wehrman and Premier,
and based upon their findings, Freeman authorized Premier
Insurance Adjusters to deny Omni's claims for collapse of the
southern wythe.  (NAS Ex. F at 2).

Omni presents the court with no affidavits, depositions or
pleadings of its own indicating any of the evidence submitted by
North American is in dispute.  Omni does make reference to Joel
Wehrman's report, which is properly attached to his affidavit.
Omni contends that the last paragraph of Mr. Wehrman's 2002
letter to Premier Insurance Adjusters establishes that Linh
Freeman received information indicating that the damage to the
second wythe in 2002 occurred during the 2000 time period.  This
is simply incorrect.  Omni's strained interpretation of Mr.
Wehrman's language is directly in contradiction with Mr.

Wehrman's extensive conclusion contained in the paragraph
immediately preceding the paragraph to which Omni refers.  To
give this language the meaning Omni asserts would be wholly
anomalous and indicate that Mr. Wehrman directly contradicted
himself in the same letter.  Omni has not pointed to any material
issue of fact questioning whether North American's reliance upon
the reports of Mr. Wehrman and Premier created arguable basis for
denying Omni's claim.  Omni also fails to raise an issue of fact
indicating that North American had any reason to believe, much
less actual knowledge as required by law, that they had no
arguable basis for denying Omni's claim.

Just as Omni fails to succeed under the "normal" theory of
bad faith, its claim also fails under the "abnormal" theory.
"Abnormal" claims of bad faith typically have been limited to
narrow situations where "the plaintiff produced substantial
evidence," to support his claim.  Nat'l Ins. Ass'n v. Sockwell,
829 So.2d 111, 129-130 (Ala. 2002).  For its part, the insurance
company is required to "marshal all of the pertinent facts with
regard to its insured's claim" before it denies the claim.  Id.
at 130.  Even assuming that NAS's refusal to pay was a breach of
contract, Omni must still produce enough evidence to raise a
factual issue as to whether NAS "failed to properly investigate
the claim or subject the results . . . to a cognitive
evaluation."  Hobbs, 858 So.2d at 974.

22

As outlined earlier, NAS's evidence establishes that Linh Freeman, on behalf of NAS, hired Premier Insurance Adjusters to investigate Omni's claim.  (NAS Ex. F at 1).  Premier investigated the scene of the claim and hired an outside engineer, Joel Wehrman to do the same.  (NAS Ex. F at 2; Ex. G. at 1).  Mr. Wehrman took photographs, visited the scene, interviewed Arnold Shiland and spoke with the contractor in charge of repairing the damage to the wall.  (NAS Ex. G at 4, 5 "attached letter").  Linh Freeman received and reviewed the results of both investigations and based her conclusion to deny Omni's claim upon these investigations.  (NAS Ex. F at 2).  Ms. Freeman's affidavit states that neither the two investigations nor her review gave any indication that the damage to the southern wythe occurred in 2000.  (NAS Ex. F. at 2).

Omni presents no evidence questioning the thoroughness of NAS's investigation.  Nor does Omni illuminate some other step that NAS might have taken or some critical piece of information that NAS failed to discover, which would have led NAS not to deny Omni's claim.  Rather, Omni relies upon blanket allegations that NAS did not subject the file to a cognitive review, only because NAS reached a different conclusion than Omni desires. Ironically, Omni concedes that all the information needed to reach the conclusion that coverage was warranted was contained in

the NAS claim file.[14]

Where a claim is evaluated and denied without critical factual information or where an insurance company creates "its own debatable reason for denying" a claim, bad faith exists. Sockwell, 829 So.2d at 130.  Likewise, if an insurance company denies a claim prior to conducting any investigation at all, bad faith exists.  See e.g., Mutual Serv. Casualty Ins. Co. v. Henderson, 368 F.3d 1309, 1317 (11th Cir. 2004).  Here however, where the defendant has offered proof of a thorough and complete investigation and evaluation of Omni's claim, and where Omni has not offered any evidence pointing to a material issue of fact, an "abnormal" bad faith claim simply does not exist.

In sum, North American has established through affidavits that it had an "arguable" basis for denying Omni's claim and that it conducted a thorough investigation before making its denial. Plaintiff has not offered any substantive evidence which raises material issues of fact challenging the facts as stated by North American.  North American is entitled to a judgment as a matter of law as to Omni's bad faith claim under both the "normal" and "abnormal" theories, and North American's motion for summary judgment should be granted.

_____

[14] This statement is found in Plaintiff's reply to NAS's motion for summary judgment, titled "Plaintiff's Objection to Defendant, North American Specialty Insurance Company's Motion for Summary Judgment," on page 12, first paragraph, third sentence.

### Omni's claims against QBE

Omni's bad faith claim against QBE fails for the same reasons that its claim against North American failed.  While Omni asserts that its claim against QBE is an "abnormal" one, it has not presented any evidence supporting such a conclusion.  <u>See</u> <u>Sockwell</u>, 829 So.2d at 129-130.  However, for the purposes of thoroughness the court will evaluate Omni's claim under both "normal" and "abnormal" theories.

Again, even assuming that Omni can meet elements (a) and (b) of a "normal" bad faith claim, the evidence offered by QBE establishes there is no genuine issue of material fact as to elements (c) and (d) of a "normal" claim.  QBE offers the affidavits of Chris Payne, Richard K. McFalls, Chester Hix and James Witcher.  Chester Hix is the claims manager for Anchor Managing General Agency, Inc. and oversaw the investigation of Omni's claim on behalf of QBE.  (QBE Ex. 7 at 1).  Chester Hix assigned the claim to one of Anchor's claims examiners and personally supervised the investigation of the claim.  (QBE Ex. 7 at 2).  The claims examiner hired an outside adjuster, Chris Payne from Mason J. Dillard, to do a full investigation of the claim.  (QBE Ex. 7 at 2).

Chris Payne then hired Richard McFalls, an engineer, to determine the cause of the southern wythe's collapse.  (QBE Ex. 7 at 2).  Richard McFalls conducted a thorough examination, took

numerous photographs and interviewed Arnold Shiland.  (QBE Ex. 3 at 2).  Mr. McFalls determined that the southern wythe collapsed in 2002 because of joint deterioration due to its repeated exposure to freezing temperatures.  (QBE Ex. A to Ex. 7 at 4). Mr. McFalls also concluded that had the wall been repaired in 2000 when the northern wythe collapsed this damage could have been avoided.  (QBE Ex. A to Ex. 7 at 4).  Chris Payne also interviewed Mr. Shiland and took pictures of the collapsed southern wythe.  (QBE Ex. 2 at 2).  Payne relied upon his own investigation and McFalls report to conclude that Omni's loss was not covered.  (QBE Ex. 2 at 2).

After the investigations, Mr. McFalls and Mr. Payne both submitted reports to Chester Hix and he reviewed them.  (QBE Ex. 7 at 3).  Mr. Hix then hired James Witcher, an attorney specializing in insurance coverage law, to give a coverage opinion.  (QBE Ex. 7 at 3).  Mr. Witcher reviewed all the reports and the policy and concluded that Omni's loss was not covered. (QBE Ex. A to Ex. 10 at 8).  After a review of all the reports, photos and investigation material, including the coverage letter was conducted, Mr. Hix denied Omni's claim.  (QBE Ex. 7 at 3).

The evidence indicates that QBE completed a thorough investigation and reviewed all the information in its possession before rendering its decision.  Under the "normal" theory, to succeed Omni must show that QBE "had no legal or factual defense

26

to the insurance claim," and that they knew it.   <u>Bowen</u>, 417 So.2d
at 183.   All that is required of QBE is that its reason for
denial be "open to dispute or question."   <u>Id.</u>   Here QBE's
decision to deny Omni's claim was based upon the opinions of an
outside insurance adjuster, a professional engineer and an
attorney specializing in coverage opinions.   All three concluded
that Omni's loss was not covered.

In response, Omni does not allege that QBE failed to
properly investigate its claim, but rather that QBE "created its
own debatable reason for denying" Omni's claim.   <u>Sockwell</u>, 829
So.2d at 130.   Omni's allegation is conclusory and not supported
by the evidence.   Omni does not present the court with any
affidavit, nor point to one entered by either of the defendants,
which indicates that QBE's reasons for denial were not at least
"arguable."   Indeed if QBE's reliance upon three outside
opinions, all concluding against coverage based upon thorough
investigation, does not create an arguable reason, presumably
nothing would.   At the most Omni has only shown that QBE's
reasons for denial might be disputed, and this is not enough to
support a claim for bad faith.   <u>See</u> <u>Bowen</u>, 417 So.2d at 183.

The evidence indicates that there is no genuine issue of
material fact that QBE conducted a thorough investigation and
that the reasons upon which they relied were at the very least
"arguable."   Accordingly, Omni cannot possibly prove bad faith

27

under either the "normal" or "abnormal" theory and QBE is entitled to summary judgment as to all bad faith claims.

### Conclusion

In conclusion, the Court finds that no material issues of fact remain and that defendants North American and QBE are entitled to judgments as a matter of law as to all claims asserted by plaintiff.  A separate final judgment will be entered.

DONE this ___8^t___ day of October, 2004

_____
SENIOR UNITED STATES DISTRICT JUDGE

28